**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICHARD JAMIE JOHNSON,

          CASE NO. 2:17-cv-13126
    *Plaintiff*,     DISTRICT JUDGE AVERN COHN
*v.*          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 16, 18)

## I.  RECOMMENDATION

  In light of the entire record in this case, I suggest that substantial evidence does not support Defendant Commissioner of Social Security's determination that Plaintiff Richard Johnson is not disabled. Accordingly, **IT IS RECOMMENDED** that Johnson's Motion for Summary Judgment, (Doc. 16), be **GRANTED**, the Commissioner's Motion, (Doc. 18), be **DENIED**, the Commissioner's final decision denying benefits be **VACATED**, and the case **REMANDED** to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## II.  REPORT

### A.  Introduction and Procedural History

  Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge to review the final decision of the Commissioner denying Plaintiff's claim for Disability Insurance Benefits (DIB). (Doc. 4.) The case is presently before the Court upon the parties' cross-motions for

1

summary judgment. (Doc. 16, 18.)

This is not Johnson's first application for Social Security disability benefits. In February 2012, he filed for Title II benefits, alleging that he became disabled on February 1, 2010. (Tr. 66.) His claim was denied by an Administrative Law Judge (ALJ) in November 2012. (Tr. 66-80.) The present application for Title II benefits was filed on January 10, 2015, alleging that his disability began roughly three years before. (Tr. 104.) The Commissioner denied the claim. (Tr. 90-104.) Plaintiff then requested a hearing before an ALJ, which occurred on June 3, 2016. (Tr. 40-56, 113-14.)  The ALJ issued a decision on September 7, 2016, finding Johnson not disabled during the relevant period. (Tr. 23-36.) On July 20, 2017, the Appeals Council denied review, (Tr. 1-3), and Johnson filed for judicial review of that final decision on September 22, 2017. (Doc. 1). He then filed the instant Motion for Summary Judgment on March 16, 2018, (Doc. 16), and the Commissioner countered with its own Motion two months later, (Doc. 18).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

2

(internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that

3

you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Johnson was not disabled. (Tr. 23-36.) At step one, the ALJ found that Johnson's last date of insured status was March 31, 2016, and that he had not engaged in substantial gainful activity since his alleged onset date of January 23, 2010. (Tr. 25-26.) At step two, the ALJ concluded that Johnson had the following severe impairments: degenerative disc disease; obesity; obstructive sleep apnea; headaches; traumatic brain injury; and posttraumatic stress disorder (PTSD).[1] (Tr. 26.) The ALJ also decided, however, that these impairments did not meet or medically equal a listed impairment at step three. (Tr. 26-27.) Next, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform:

> Light work [as defined in 20 C.F.R. § 404.1567(b)] except that he can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for six of eight hours; can push and pull [as] much as he can lift and carry; can occasionally climb ramps and stairs; no climbing ladders, ropes, and scaffolds; can do occasional balancing, stooping, crouching, kneeling, and crawling; needs to avoid all hazards, including unprotected heights, moving mechanical parts, and operating a motor vehicle; needs to avoid concentrated exposure to respiratory irritants and extreme temperatures; is limited to unskilled work that does not involve a fast production pace set by others; cannot work with bright lights, meaning no more than office setting lighting; no more than office environment noise; and cannot work with the general public.

(Tr. 27.)[2] At step four, the ALJ found Johnson unable to perform any past relevant work.

---

[1] By contrast, in Johnson's 2012 application, the ALJ found that the severe impairments were PTSD, migraines, sleep apnea, and hearing loss. (Tr. 68).

[2] This was more restrictive than the 2012 RFC, which stated that Johnson could

> perform a full range of work at all exertional levels but with the following nonexertional limitations: He should never work with the general public. He

(Tr. 35.) Finally, at step five, the ALJ determined that Johnson could perform a significant number of jobs in the national economy. (Tr. 35-36.)

### E.    Administrative Record

#### 1.    Medical Evidence

Johnson, while a Marine in Iraq in 2006, suffered a closed-head injury. (Tr. 43, 181.) He attributes his subsequent history of migraines to that injury. (Tr. 43.) Records from the Veteran's Administration (VA) begin in 2012 with a report connected to his application for VA disability benefits. (Tr. 279.) He was diagnosed with obstructive sleep apnea and used a CPAP machine but not any continuous medication. (Tr. 279-80.)[3] A 2010 sleep study diagnosed mild obstructive sleep apnea, the report notes. (Tr. 281.) Johnson reported feeling tired at work because of the apnea. (Tr. 282.) Regarding his mental health, he was diagnosed with PTSD, but did not have "more than one mental disorder diagnosed."[4] (Tr.

---

is limited to unskilled work that does not involve a fast production pace set by others; no bright lights (meaning no more than office setting lighting); and no more than office environment noise. The claimant is further limited to jobs that do not involve working at unprotected heights or around dangerous moving machinery.

(Tr. 71).

[3] In the VA file, there are records of earlier procedures, including a successful septoplasty to treat Johnson's nasal obstruction and septal deviation. (Tr. 360-61.)

[4] He was also assessed a Global Assessment of Functioning (GAF) score of 60, (*see also* Tr. 336), which signifies "moderate symptoms" or moderate difficulty in social, occupational, or school functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., 2000). Reliance on GAF scores has been called into question, *see Spuhler v Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *16 (E.D. Mich., June 17, 2014) (discussing caselaw), *rep. & rec. adopted in relevant part by* 2014 WL 4856153 (E.D. Mich., Sept. 30, 2014); *Richardson v. Comm'r of Soc. Sec.*, 70 F. App'x

288-89.) In a check-box portion of the form, it was noted that Johnson had "[o]ccupational and social impairment with reduced reliability and productivity." (Tr. 290.)

A background section on the form stated that Johnson had two children who resided in the Bahamas, he lived independently (of his family) since 2012, and had a "'good' relationship" with his live-in girlfriend, who he hoped to marry soon. (Tr. 292.) He exercised at a local gym and attended school. (*Id.*) Johnson reported that he received counseling for two weeks after his 2006 tour in Iraq, and that he also received evaluations for his traumatic brain injury and PTSD. (Tr. 293.) Zoloft, a psychotropic medication, helped in the past but produced side-effects and he stopped taking it; currently, he took nothing. (*Id.*)

While in Iraq, Johnson related, a comrade was killed by an explosion while they were on patrol. (Tr. 294-95.) On another occasion, an explosion caused his traumatic brain injury. (Tr. 295.) But attacks and explosions happened daily. (*Id.*) The symptoms were depressed mood, anxiety, suspiciousness, panic attacks at least once a week, and chronic sleep impairment; but he did not have other symptoms, including, memory loss, impaired judgment, and "[d]ifficulty in adapting to stressful circumstances, including work or a worklike setting," (Tr. 298.) These episodes and symptoms were enough for the examiner to diagnosis PTSD. (Tr. 295-99.)

---

537, 539 (6th Cir. 2014) (noting that the GAF scores alone were "insufficient to undermine the ALJ's decision"), and the leading diagnostic treatise now rejects their use, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

7

Another portion of the form dealt with Johnson's migraines. (Tr. 304-07.)[5] Johnson reported that his headaches had increased to four or five a week, and he had three or four severe migraines a month. (Tr. 305.) Four or five times each month, the pain forced him to remain in bed for the day. (*Id.*; *see also* Tr. 306-07 (noting that prostrating migraines occurred more than once per month, and the non-migraine headaches were not prostrating).) The pain worsened with physical activity. (Tr. 305.) He also experienced nausea, vision changes, and sensitivity to light and sound. (Tr. 305-06.) The physician concluded that the condition would affect Johnson's ability to work, stating he could "do light duty jobs." (Tr. 307.)

The VA file also contains various records of treatments. In an April 2012 psychiatric evaluation, Johnson relayed much of the same information as above. (Tr. 370-75.) He added that he had short-term memory loss. (Tr. 370.) His relationship with his family was good, Johnson stated. (Tr. 374.) On return from his military service, he said, he felt well-received and special. (Tr. 375.) He began school (which he struggled with) and intended to work for the upcoming summer. (Tr. 375.) The counselor noted that most mental status measures were normal, except Johnson's memory and judgment were impaired, his thinking was disorganized, and he experienced hallucinations. (Tr. 372.) He clearly "demonstrate[d] symptoms related to [traumatic brain injury] and to PTSD." (*Id.*)

---

[5] The check-box question for whether Johnson had been diagnosed with a "headache condition" was left black, but the physician went on to answer more check-box questions that applied only if there had been such a diagnosis. (*Id.*)

At a checkup in October 2012, Johnson reported he had headaches twice a week, (Tr. 353), although at a subsequent session the same month he reported four or five headaches each week. (Tr. 347.) The medical history section indicated low-back pain and insomnia, among other maladies. (Tr. 354.) The physical examination results were normal, (Tr. 354-55), as they were at another examination later that month, (Tr. 347).

The same month, he participated in a PTSD group therapy session and was "active and engaged and fully participated." (Tr. 359.) At an individual therapy session, he was normally oriented but a bit argumentative, gradually becoming more cooperative. (Tr. 351.) His mood—which generally is the measure marking depression, anxiety, euphoria, and the like, *see* David C. Martin, *The Mental Status Examination*, in *Clinical Methods: The History, Physical, and Laboratory Examinations*, chp. 207, p. 925 (Walker, *et al.*, eds. 1990)—was anxious and irritable. (Tr. 351.) At another session a few days later, with his fiancée in tow, he was again initially argumentative, with an anxious and irritable mood, but settled down as the session progressed. (Tr. 346.) His "homework" had helped him experience "habituation," (*id.*), which typically means that he was growing less afraid of being exposed to stimuli that had caused fear in the past, *see* Benito & Walther, 6 J. Obsessive Compulsive Related Disorder 147 (July 2015), online version at *1, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4525711/pdf/nihms662091.pdf.[6]

---

[6] A note from November 2012 written by a counselor, described a phone call with Johnson in which she advised that their sessions end because he had missed multiple appointments and was frequently tardy. (Tr. 344-45.) He was "discharged," (Tr. 345), although he did continue attending group therapy sessions (the notes from which are not very illuminating), (Tr. 341-43.)

9

In January 2013—after the ALJ's denial of his first claim for Social Security benefits in November 2012—he saw a psychiatrist who noted that Johnson's mood was euthymic, (Tr. 336)—a conclusion that usually means "a patient, in the longitudinal course of mood disturbances, no longer meets the threshold of a disorder such as depression or mania, as assessed by categorical methods resulting in diagnostic criteria or by cutoff points in the dimensional measurement of rating scales." Fava & Bech, *The Concept of Euthymia*, 85 Pyschotherapy & Psychosomatics, 1, 1 (August 2015). His insight was limited and his judgment impulsive, but otherwise he was normal (*e.g.*, he had coherent thought process and spoke normally). The current stressor in his life was school. (Tr. 336.) The report contains a list of Johnson's responses to stock questions generated on a form. (Tr. 338.) Among his answers were that he believed that he lost interest in enjoyable activities, felt distant from others, and had trouble sleeping. (Tr. 339.) He declined further treatment. (Tr. 336; *see also* 340.)

The VA files contain therapy records—many from group sessions, without much useful information on Johnson—from 2012 through 2015.[7] (Tr. 370-428.)[8] His school and

---

[7] Only one session from 2015 appears, (Tr. 390), and it seems as though it was to reestablish treatment because it reintroduces the same general problems that had been addressed throughout the preceding three years' worth of treatment. His assessment was guarded, but only "due to his lack of contact with the Vet center." (*Id.*) The note ends by closing the case file, a decision required due to Johnson's "noncompliance with treatment." (Tr. 429.) In an earlier file, Johnson observed that some of his treatments were not completed "due to his need to concentrate on school work." (Tr. 601.) Later, however, he stated that his "inability to fully engage" with these exposure-based treatments stemmed from the difficulty of being reminded of the traumatic event. (Tr. 552.)

[8] His habit of missing appointments continued. *See supra* note 6. He missed one session in May 2012 because he "was called into work," (Tr. 427), and another session note from the

work were mentioned throughout the records, as were his vocational goals (such as becoming a doctor). (*See, e.g.*, Tr. 398, 399, 405, 406, 415, 418.) For example, the notes for one session reported he was "working hard in school but his biggest obstacle is being able to concentrate and focus." (Tr. 418.) Some notes mention generalized troubles with school, (Tr. 400, 405, 406, 413), but in others he reported "doing well in school," (Tr. 409).

In one session, the counselor told Johnson it seemed unlikely he could complete a "bachelor[']s level corse [sic] let alone medical school." (Tr. 406.) Later, however, Johnson indicated he did well in social sciences, but less so in mathematics, where he required assistance to "get through." (Tr. 401.) Still, he was eligible for an associate's degree, his school counselor encouraged him to receive the degree, he sought to improve his GPA, and the therapist was "able to help him see that there are many jobs he could have in the social science field." (*Id.*) After reporting that he was working hard at school in the spring of 2013, he finished with his highest GPA (3.6) and said he felt healthier (aside from the migraines). (Tr. 397-399.) He planned on entering the social work program. (Tr. 397; *see also* Tr. 606 (noting Johnson's career plans in social work).) A few months later, the records note that "although he has struggled somewhat in school," mostly due to the brain injury, "he is doing better of late." (Tr. 395.) In the fall of 2013, the notes indicate Johnson was a few months away from graduating as a paramedic; the counselor thought he had "made some great improvements" and was working hard. (Tr. 392.)

---

same month noted scheduling difficulties due to Johnson's school and work. (Tr. 425.)

In the same therapy file, other session records report healthy relationships with his fiancée and others. (Tr. 413.) In June 2012, he reported continuing improvement and that he was "feeling much better and his relationship are [sic] improving." (Tr. 425.) Numerous records report such improvements or Johnson's efforts to make progress, and his active participation in group therapy. (*See, e.g.*, Tr. 388, 392, 397, 398, 403, 409, 412, 415, 416, 418, 419, 420, 424; *see also* Tr. 601 (noting, in a different VA record, that he feels he has improved but still struggles with sleep); 606 (noting, in a different VA record, Johnson's "[s]upportive relationship" with his girlfriend).) During some sessions (or phone calls recorded in the notes), he was withdrawn or noted his struggles with anxiety, memory, relationships, or PTSD, (*see, e.g.*, Tr. 382, 391, 398, 401, 412, 413, 414, 417, 419, 423), although even during some of these times the counselor observed Johnson's positive progress, (*see, e.g.*, Tr. 419, 423). In one session, the counselor discussed Johnson's difficulties adapting to civilian life. (Tr. 405.)

Regarding his physical problems, around February 2013, he visited the hospital to get replacements for CPAP parts. (Tr. 321-22.) He reported that he was "doing well, 'the CPAP is working wonders for me' and his headaches are '90% reduced.' 'I love it (CPAP).'" (Tr. 321.) His insomnia had not recurred. (*Id.*) Though he had a sleep study scheduled for later that month, "he states he does not know why it was scheduled and feels he is sleeping well." (Tr. 322.) A daily, 20-minute nap taken some time between noon and 5 p.m. refreshed him when he was "short on sleep." (*Id.*) The notes also state that he switched majors at college and his vocational goal was to become a pediatrician. (*Id.*) He exercised a few times each week and was trying to lose weight. (Tr. 322, 326.) The medical

history section included various items, such as low back pain and obesity. (Tr. 323.)[9] The physician's assessment was mild obstructive sleep apnea and he discharged Johnson from the sleep clinic, suggesting he return in a year. (Tr. 326.)

At a general session the following month, Johnson noted that medication (Imitrex) was "controlling headaches" and he was "controlling back pain."[10] (Tr. 314.) The examination uncovered no abnormalities, although he had back pain with range of motion testing. (Tr. 315.) The assessment noted the full roster of Johnson's conditions, past and present, including memory difficulties and headaches, which were again noted to be abating with medication. (Tr. 318.)

A separate VA primary care report from June 2013 screened Johnson as "negative" for depression, anxiety, "panic," dysthymia,[11] and physical pain. (Tr. 601, 605, 609-610.)[12] The report also detailed his regimen of weightlifting and cardiovascular exercise to lose

---

[9] Similar lists appear elsewhere throughout the record. *See, e.g.*, (Tr. 312).

[10] Johnson also stated that Tylenol was effective too. (Tr. 613.)

[11] Dysthymic disorder is a chronic, long-term depressive condition. *See* Stewart, *Atypical Depression, Dysthymia, and Cyclothymia*, in *The Textbook of Mood Disorders*, ch. 33, pp. 547, 551 (2006, Stein, et al., eds.).

[12] Admittedly, the "screens" in the report are somewhat ambiguous. For example, another depression screen came back "suggestive of no depression," yet the report later states that a "[p]ositive depression screen [was] evaluated." (Tr. 603-604.) Likewise, one PTSD screen came back negative, (Tr. 610), and another positive, (Tr. 602-03). It appears the screens were similar, if not identical (both seem to have been four-item primary care PTSD screens); though it is true that multiple PTSD screens exist. *See* Gerrity, et al., *Screening for Posttraumatic Stress Disorder in VA Primary Care Patients with Depression Symptoms*, 22 Soc'y of Gen. Internal Med. 1321, 1321 & nn. 8-12 (2007).

weight. (Tr. 605-06.)[13] However, the treatment plan accounted for his migraines (about one a week) and his PTSD. (Tr. 608.) The report also notes that a 2012 brain MRI was normal. (Tr. 607.) A physician noted that Johnson had reported only "mild memory issues after" the brain injury. (Tr. 609; *see also* Tr. 606 (noting only mild memory impairment).)[14] The mental status examination was normal, although Johnson's mood was "mildly anxious." (Tr. 602.) He did not feel the need for ongoing case management services, however, and the counselor agreed. (Tr. 598.) Nonetheless, Johnson began treatment and the following month's notes record his worsening symptoms as he experienced various sources of stress (such as school, supporting his girlfriend, and worrying about his future).[15] (Tr. 595.) As noted at a later session, he would sometimes procrastinate doing his homework by cleaning

---

[13] At a weight-loss assessment in July 2013, John said he exercised four times a week, doing both cardiovascular exercises and strength training. (Tr. 587.) The evaluator recommended adding a day of exercise as prescribed by the primary care physician and as "tolerated." (Tr. 588; *see also* Tr. 563 (also encouraging exercise as tolerated and with physician approval).)

[14] It appears that this observation was part of an elopement risk assessment, which is the risk that a patient intentionally leaves a care facility without permission. Gerardi, *Elopement*, PSNet (Dec. 2007), *available at* https://psnet.ahrq.gov/webmm/case/164#references (using definition from the VA). A few months later, in the same series of reports, it was noted that Johnson "did memory exercises almost daily." (Tr. 579.) This observation was followed by the statement, "SUDS levels decreased from 8 to 5." (*Id.*) The report does not define SUDS or state whether the decrease resulted from the exercises. However, it appears that SUDS is an acronym for "subjective units of distress scale," which is used in PTSD treatment to "measure self-reported distress levels." Bluett, et al., *Does Change in Distress Matter? Mechanisms of Change in Prolonged Exposure for PTSD*, 45 J. Behavior Therapy & Experimental Psychiatry 1, 4 (2014).

[15] Stress from school and caring for his girlfriend was also noted in other records. *See, e.g.*, (Tr. 442, 528, 552, 565.) Likewise, he frequently reported anxiety. *See, e.g.*, (Tr. 487.)

the house or budgeting. (Tr. 565.)

But in July, his PTSD was marked as stable, and it was reported that he was finding counseling helpful, his nightmares (which had been bad) were decreasing, and symptoms were less intrusive, though his anxiety regarding school had increased. (Tr. 573, 576.) He had made undescribed healthy lifestyle changes to lose weight—and the physician recommended exercise (and a prescription) to treat his chronic lower back pain, which resulted from degenerative discs and spondylosis. (Tr. 576-77.)

On September 20, 2013, Johnson walked into the emergency department to seek treatment for back pain, which had begun three days earlier. (Tr. 571.) The pain had gradually eased since then, and he had lifted weights and run; "running feels fine," the notes say. (*Id.*) His neurological examination revealed full strength. (*Id.*) The diagnosis was "lumbago possible disc herniation" and "conservative management [was] extensively discussed." (*Id.*)

Johnson was referred for a more thorough psychiatric evaluation in November 2013, with the goal of helping him learn coping skills. (Tr. 551.) He discussed his career goals, explaining he no longer thought being a pediatrician was feasible, but he was interested in mental health, criminal justice, and nursing. (Tr. 552.) School was currently "a bit" of a struggle, and he had to drop a math class, (*id.*), though he was a full-time student. (Tr. 553-54.) But he "denie[d] past depressive episodes or current depressed mood," panic attacks, and social anxiety; he reported enjoying reading and yoga. (Tr. 552.)[16]

---

[16] As the notes state, Johnson "denied most emotional complaints during the interview," but the counselor suspected he was "underreporting his actual psychological concerns."

According to the mental status examination, Johnson was normal by most measures (*e.g.*, speech, thought process, insight/judgment), but he had an "apprehensive" mood and constricted affect. (Tr. 554.) Cognitive test scores were "typically solid," though there were a few unexpected declines from earlier tests taken in 2008 and 2010. (*Id.*) Nonetheless, "his cognitive abilities were largely intact, as evidenced by solid performances in all domains." (Tr. 554-55.) The counselor wrote, "Although Mr. Johnson's cognitive performance did not evidence consistent evidence of memory difficulties if he continues to experience self perceived difficulties with his memory it is recommended he may benefit from simple adaptive techniques." (Tr. 555.) The counselor admitted she had difficulty assessing whether Johnson had "clinically significant difficulties with attention," and she suspected anxiety was "at least partially contributing to his academic struggles." (Tr. 556.) An additional assessment section of the report indicated that Johnson rated his headache pain at 2 on a scale from 1 to 10, with 10 being extreme pain—but the pain impaired functioning. (Tr. 557.)

Later the same month, Johnson estimated he had three to four migraines per month. (Tr. 547.) Regarding his lower back pain, he reported that exercises had "been really helpful" and that he had "not needed pain meds or methocarbamol recently." (*Id.*)

In March 2014, Johnson saw his primary care physician. (Tr. 528.) He felt "pretty good physically" and was not down or depressed, just anxious and distracted at times. (*Id.*)

---

(Tr. 555.) However, his self-reported symptoms were generally at a clinically significant level. (Tr. 559.)

His headaches occurred almost every day, but only two to three each month were migraines. (*Id.*) The migraines were debilitating, but the daily headaches were manageable and he could attend school and complete his normal routine. (Tr. 531.) His lower back pain was "really minimal" despite doing fewer back exercises. (*Id.*)[17] His examination was largely normal, for present purposes, and his affect was "less flat/more animated." (Tr. 530.) His PTSD seemed stable. (Tr. 531.) On the same day as this visit, he had a psychiatric session. (Tr. 525.) Under a heading called "Patient's Limitations," the report states, "No significant limitations." (Tr. 526.)

In April 2014 after an in-person examination, a physician completed a VA disability questionnaire focusing on Johnson's headaches. (Tr. 515.) Johnson recounted his history of headaches, noting that Imitrex was effective and that during stressful times his migraines increased from two to three times a month to six times; but with the medication, he would have only three to four. (Tr. 516.) Over the last several months, he had had only one prostrating headache each month. (Tr. 17.) The physician concluded that the headaches might cause Johnson to miss work two to three times per month, but that he "would not be limited in physical or sedentary work" as long as he could take his medication at the onset of his headache. (Tr. 518.)

---

[17] The same month, he informed a nurse that he had not met his physical activity goals for the month, but that he had just purchased P90X for exercise. (Tr. 520.) And the following month he reported exercising regularly. (Tr. 488.) A few months later, in June, he was still exercising and had lost some weight. (Tr. 469.) He hoped to increase his exercise (swimming and weight training) from four to five days each week. (Tr. 463.)

Another disability-related form—this one focusing on PTSD—was completed around this time. (Tr. 503.) Johnson said his relationship with his children was good, and that he spent time with other family, but he had no friends. (Tr. 506.)[18] His migraines prevented employment, he said. (*Id.*) He was enrolled in two classes, after dropping a third, and he denied missing any classes (which he attended two days a week) due to anxiety or migraines. (*Id.*) A master's in social work was Johnson's next goal. (Tr. 507.) Recently, he was stressed and having three to four nightmares each week. (Tr. 508.) Trusting others was difficult for him, and he felt ostracized from society. (*Id.*) He was hypervigilant about safety. (*Id.*) Still, there were things he enjoyed doing, such as "reading, studying[,] watching movies, and grocery shopping." (Tr. 509.)

The physician's assessment criteria determined that Johnson had moderate depression and mild anxiety. (Tr. 512.) But, the report notes, Johnson "did over-report somatic and cognitive symptoms," as evidenced by his description of having symptoms that are "rarely described by individuals with genuine and severe medical problems. He over-reported a very unusual combination of responses that is associated with non-credible reporting of somatic and/or cognitive symptoms." (Tr. 513.) The physician observed that his symptoms were much reduced since a previous examination in 2012, and that he had moderate PTSD. (Tr. 514.) He concluded that Johnson had occupational and social impairment with "occasional decrease in work efficiency and intermittent periods of inability to perform occupational task, although generally functioning satisfactorily with

---

[18] Later in the month he said his relationship with his girlfriend was going well. (Tr. 488.)

normal routine behavior, self-care and conversation." (Tr. 504.) Johnson's symptoms would not preclude gainful work, as shown by the fact that he had "been successfully attending classes at a community college while earning average grades, which is commensurate with his success in elementary and high school." (Tr. 514.)

In May 2014, a similar VA disability form was also filled out regarding Johnson's traumatic brain injury. (Tr. 494.) The report notes that after Johnson's injury, he was eventually cleared for additional deployments, although he felt cognitive decline during those deployments. (*Id.*) Johnson was attending Oakland University but had to drop three classes due to "poor focus, time management, and organizational skills." (Tr. 495.) (However, in a counseling session later the same month, he said he had to drop one class last semester and barely passed the others. (Tr. 487.)) The examination returned generally normal results, except for those sections relying on subjective reports (*e.g.*, "subjective symptoms" and "[n]eurobehavioral effects"). (Tr. 495-96.)[19] The report also stated that Johnson had no "mental, physical[,] or neurological conditions or residuals attributable to" the traumatic brain injury, such as migraines. (Tr. 497.) The examiner concluded that residual conditions associated with the injury (which he characterized as a concussion) would not affect Johnson's ability to work. (Tr. 497.)

The same month, a psychologist performed a neuropsychological evaluation of Johnson. (Tr. 491.) The report notes that Johnson's scores might underestimate his current

---

[19] Other mental status examinations also produced normal results, although sometimes his mood was stressed. *See, e.g.,* (Tr. 434, 436, 440, 443, 461, 470, 481.)

cognitive abilities, as his engagement was variable and there were interruptions during the testing. (Tr. 493.) His general cognitive performance was "low-average," as was his visuomotor speed and immediate verbal memory; he was in the "borderline impaired range" in delayed verbal memory; he was in the "high-average range" in simple attention, working memory, and speeded word reading; and average in set-switching, speeded color naming, and selective attention. (*Id.*) The results were consistent with mild traumatic brain injury. (Tr. 494.)

In June 2014, Johnson reported to his psychiatrist that school was less overwhelming, as he was taking only one class, on theater. (Tr. 469.) He was also planning to propose to his girlfriend and they were preparing for in vitro fertilization. (*Id.*) At the end of July, his symptoms were stable. (Tr. 460.) He found some of his coursework interesting, and most of his stress came from trying to start a family. (*Id.*)

In a December 2014 counseling session, Johnson reported that he had married in October and his wife was pregnant. (Tr. 435.) Her health problems, however, stressed him and he consequently failed a class at school. (Tr. 436.)

One of the psychiatrists who worked with Johnson, Dr. Lindsay-Rose Dykema, wrote a letter in 2014 on behalf of Johnson's claim for VA benefits. (Tr. 632.) The letter details much of the same information noted above, adding that Johnson "has struggled academically, and having [sic] to drop several others." (*Id.*) This was connected to his problem concentrating. (*Id.*) He was "very engaged" in his "treatment and demonstrates

20

numerous strengths, including work ethic."[20] (*Id.*)

As part of his application, Johnson submitted to an examination by an internist on March 13, 2015. (Tr. 620.) Johnson complained of constant, non-radiating back pain, which had been treated with physical therapy and epidurals providing "temporary relief." (*Id.*) He struggled with his memory and following instructions, and he had migraines every day. (*Id.*) He was not on antidepressants. (*Id.*) He was moderately obese and had gained about 20 pounds recently. (Tr. 621.) His speech, gait, and coordination were normal, his tendon reflexes were sluggish, and his mood seemed flat. (Tr. 622.) The diagnosis was obstructive sleep apnea, back pain due to degenerative discs, PTSD, and obesity. (*Id.*)

He also received a mental status evaluation as part of his claim. (Tr. 628.) The report notes that Johnson had an associate degree. (*Id.*) Johnson told the examiner that he forgets to take a shower unless he saw it on his chalkboard to-do list; he read, but his poor memory forced him to reread the material. (*Id.*) "Everything takes him a long time to do." (*Id.*) The day of the examination, he drove himself, but a migraine had developed and he planned on calling his wife for a ride home after the appointment. (*Id.*) Despite the migraine, the examiner's general observations were normal: Johnson was cooperative, properly oriented; neatly dressed, logical, and organized; his speech was alternatively slow and spontaneous; and his affect was flat. (Tr. 628-29.) Johnson denied being depressed but admitted he could become irritable and angry at times. (Tr. 629.) In the "medical source statement,"

---

[20] Dr. Dykema's conclusion was that Johnson's disability rating should indicate greater disability—this relates to the VA disability benefit system, *see, e.g.*, 38 U.S.C. § 1151.

consisting of a paragraph, the examiner noted Johnson's traumatic brain injury, his flashbacks, and other subjective reports from Johnson; then the examiner concluded, "His affect is flat and his mood displays no affect. He was cooperative with examiner. He does not appear able to do work related activities with his memory problems, head injury and PTSD." (Tr. 629.)

The last passel of VA reports—and the final medical files in the record—date from January 2015 until March 2016. (Tr. 633-841.) These records largely replicate the information above. In most, the mental status examination produced normal results, with his mood sometimes variable (*e.g.*, hectic, anxious, euthymic, lethargic, "okay," concerned, or cautious) and his affect sometimes constricted. *See, e.g.*, (Tr. 685, 704, 706, 708, 761, 766, 769, 777, 781, 801.) His reporting of his medical history, including the headaches, mental confusion, PTSD, and marital stress, remained the same. *See, e.g.*, (Tr. 708, 766, 777, 785.) His child was born, (Tr. 781), and he reported being the primary caregiver, (Tr. 760). His headaches were sometimes better, (Tr. 774), as was his sleeping (despite problems with his CPAP machine), (Tr. 771).[21]

An MRI in December 2015 revealed no "evidence of acute intracranial pathology." (Tr. 722.) At the MRI session, he reported unchanged headaches; the physician's notes

---

[21] In one session he reported feeling tired but being able to function. (Tr. 768.) His 2010 sleep study, diagnosing mild obstructive sleep apnea, also appears in this batch of records. (Tr. 758-56.) In August 2015, he attended a sleep disorder clinic, reporting that his sleep changed after his child was born but had stabilized. (Tr. 750.) He was reported "[n]oncompliant with therapy because he feels his humidifier is broken." (Tr. 755.) But by April 2016, he said his medication helped. (Tr. 684.)

state, "currently on topamaz 25 mg bid- would like to wait to titrate up [*i.e.*, increase the dose] for unclear reasons." Around the same time, however, he reported increased headaches, with migraines occurring seven to eight times per week. (Tr. 717.) Medication helped, but only if used early enough. (*Id.*) (*Id.*) Later, he reported that newer medications helped "a bit." (Tr. 705.) He missed some appointments. (Tr. 672, 676, 680, 687, 690, 700-02, 713, 723, 725, 726, 728, 744, 796, 798.) He was encouraged to continue cardiovascular exercise after he had stopped one program he felt was "too rigorous." (Tr. 774; *see also* Tr. 694, 720.) At one session he reported his low back pain symptoms were "really minimal . . . now." (Tr. 720.)

School was ongoing. (Tr. 705, 725, 768, 772.) As late as April 2016, he reported being a full-time student. (Tr. 684; *see also* 705.) He had to take an "incomplete" in one class in a prior semester due to his migraines, (Tr. 705); the current semester was going better. (*Id.*) Despite having to retake a class, he was scheduled to graduate in 2017. (Tr. 684.)

What was new, though, was left elbow pain, which Johnson reported in May 2015, (Tr. 790), and again in an email the next month, (Tr. 782). It had begun three to four months prior. (Tr. 790.) The pain had started to radiate by June, but he did not think he needed to attend the emergency room. (Tr. 782.) In July, he reported he had stopped working out and lifting weights "in hopes that [the] pain would improve." (Tr. 771.) The physician noted some point tenderness in the elbow, normal range of motion without pain, but some pain on the side when his hand and forearm were fully supine. (Tr. 772.) She diagnosed lateral epicondylitis (tennis elbow) in his left arm and treated it with a cortisone injection. (Tr.

773.) The shot eliminated the pain for about two months, but it returned and worsened in October—a 6 out of 10 on a visual analogue scale. (Tr. 737.) He was not taking any pain medications, and the primary care physician recommended he purchase over-the-counter medication. (Tr. 737-38.)

In November, the elbow pain, as well as worsening migraines, sent him to the emergency room. (Tr. 731.) Ibuprofen had only mildly improved the pain. (Tr. 731.) The migraines, which had usually occurred once a week, were now happening twice each week, causing disorientation, nausea, and blurred vision, among other things. (*Id.*). The examining physician found that Johnson's *right* elbow (recall that earlier he had claimed his *left* elbow hurt) was tender to the touch compared to his *left* elbow and had probable lateral epicondylitis. (*Id.*) He was prescribed medications for both complaints. (Tr. 731-32.) Later, lidocaine cream was noted to help the elbow, although he had difficulty remembering to put it on and it would rub off. (Tr. 714, 717.)

### 2.   Application Reports and Administrative Hearing

#### i.   Plaintiff's Reports

In his function report, completed in February 2015, Johnson said that on a typical day he stayed in with migraines unless he had therapy. (Tr. 206.) He took care of his wife and two cats. (*Id.*) His disabilities impacted his personal care, as he got confused when dressing, forgot to shower, needed reminders to take medicine, and struggled with good nutrition. (Tr. 206-07.) The only housework he could do—when he was reminded to do it—was wash dishes, and this took him an hour. (Tr. 207.) He could travel by walking or driving, and he shopped in stores. (Tr. 208.) He had no problem handling money. (*Id.*) As

for hobbies, he enjoyed reading a few times a week. (Tr. 209.) Social activities included talking with his wife and going to counselling sessions (which he needed someone to accompany him to). (*Id.*) His conditions affected every possible ability they could (except sight), from lifting, squatting, reaching, to concentrating, understanding, kneeling, and getting along with others. (Tr. 210.) He could walk one-eighth of a mile before having to rest for five minutes; he could pay attention for up to a minute; he poorly followed written or spoken instructions; he poorly handled stress and change; but he got along well with authority figures. (Tr. 210-11.)

### ii.       Plaintiff's Testimony at the Administrative Hearing

At the June 3, 2016 hearing, Johnson testified that he had headaches six days a week, usually lasting from two to six hours. (Tr. 43.) The migraines occurred two times a week, each lasting a full day, if not two or three; they were debilitating and he stayed inside, without lights or noises, and he grew nauseated. (*Id.*) The narcotics he was prescribed made him "sick and throw up"; "medication masks the headache. So it doesn't prevent it and doesn't stop the pain, so it's not working." (Tr. 44.) His PTSD caused nightmares every night, disorganization, lack of trust, hypervigilance, and fear of being in public. (Tr. 44-45.) As a result of these conditions, he usually liked to stay at home. (Tr. 45-46.) He could read, but only for 10 minutes. (Tr. 46.)

The ALJ explained that Johnson had "to show me that your condition is worse now than it was last time." (Tr. 48.) He asked whether Johnson's condition had changed since he last applied for benefits. (Tr. 47.) Johnson responded that his migraines had worsened

and that MRIs had discovered something in his brain. (*Id.*)[22]

In a final dialogue with Johnson's attorney, the ALJ asked, "What about the sitting, standing, walking, and lifting, is there a problem there?" (Tr. 49.) The attorney replied, "None that would be sufficient to warrant a claim for Social Security Disability." (*Id.*)

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ constructed the following hypothetical RFC:

> 20 pounds occasionally, 10 pounds frequently, that's lifting, carrying. There's sitting six hours, standing six hours, walking six hours, pushing and pulling as much as he can lift and carry. There's occasional climbing of ramps and stairs, no climbing ladders, ropes, or scaffolds, occasional balancing, stooping, kneeling, crouching, and crawling. There's a need to avoid all hazards including unprotected heights and moving mechanical parts, operating a motor vehicle. There's a need to avoid concentrated exposure to respiratory irritants, extreme temperatures. Also he's limited to unskilled work that does not involve a fast production pace set by others, no bright lights, limited to no more than office setting lighting and no more than office environment noise. He should also never work with the general public.

(Tr. 52.) Could an individual with these restrictions perform any of Johnson's past relevant work, the ALJ asked the VE. (*Id.*) No, the VE replied, but there were jobs that the individual could perform, including garment sorter (3100 such jobs existed in southeast Michigan, 200,000 in the nation) and inspector positions (2500 jobs in southeast Michigan, 830,000 in the nation). (Tr. 53.) If the individual could rarely have contact with coworkers or supervisors (10 percent of the day or less), the individual could not complete the jobs

---

[22] As noted above, however, the MRI found no "evidence of acute intracranial pathology." (Tr. 722.) Perhaps Johnson meant the "[s]ignal abnormality and prominence of the right lesser wing of the sphenoid," which the MRI report also described. (*Id.*) But the MRI report stated that this finding was "likely not significant changed since 8/11/2010," and thus it was not a new revelation from the MRI. (*Id.*)

above. (Tr. 55.)

The ALJ then added the following restrictions to his original hypothetical: sitting for only 5 to 10 minutes; walking 2 blocks, lifting 20 to 25 pounds. (Tr. 53.) The individual could perform the same positions, but the VE reduced the number of available positions by half. (Tr. 54.) If the non-exertional limitations that Johnson claimed were added to the hypothetical, the VE concluded that there were not a significant number of jobs in the regional or national economy that the individual could perform. (*Id.*) Specifically, the migraines or the lack of focus would each preclude work. (*Id.*)

## F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[23] carve the evidence into various

---

[23] Various amendments have been made to the regulations since Johnson filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed. Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec.*

categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the

---

*adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by

record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[24] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

---

[24] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

    (i)     [D]aily activities;
    (ii)    The location, duration, frequency, and intensity of . . . pain;
    (iii)   Precipitating and aggravating factors;
    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)    Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th

Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing the RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Plaintiff makes three arguments. First, he says that res judicata "does not bar a more restrictive RFC than in the prior decision, given evidence demonstrating a worsening of plaintiff's condition since that time." (Doc. 16, at ID 925.) Second, he contends "the ALJ's RFC analysis is not supported by substantial evidence." (*Id.* at ID 927.) Third, the ALJ "erred in failing to account for plaintiff's elbow impairment." (*Id.* at ID 930.) I will address each of these arguments in turn.

### 1.   *Res Judicata*

Until recently, the leading case on *res judicata* in this Circuit was *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997).[25] There, the court held that the "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (1997). The Social Security Administration then issued an Acquiescence Ruling on *Drummond*:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim . . . unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

Recently, however, the Sixth Circuit clarified the meaning of *Drummond*. In *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018), the ALJ had thought *Drummond* precluded him from revisiting an earlier finding that the claimant was not disabled unless she offered new and material evidence of a changed condition. But this belief was incorrect. Rather, the Sixth Circuit explained, "[a]n individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long

---

[25] As the Third Circuit has explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel, is less expansive, "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Id.*

as the claimant presents evidence of a change in condition or satisfies a new regulatory condition." *Id.* at 932. As such, *res judicata* does not "prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.* at 931.

Courts applying *Earley* to ALJ decisions issued before that case have asked whether the ALJ, despite purporting to follow *Drummond*, gave the new evidence a fresh look. If so, then the ALJ's decision satisfied *Earley*; if not, then remand was appropriate. *See Snyder v. Comm'r of Soc. Sec.*, No. 1:17-cv-486, 2018 WL 4658813, at *3 (W.D. Mich. 2018) (finding that the pre-*Earley* ALJ decision satisfied *Earely* by "effectively re-open[ing]" the prior ALJ's decision); *Dunn v. Comm'r of Soc. Sec.*, No. 1:17-cv-634, 2018 WL 4574831, at *3 (W.D. Mich. 2018) (reversing where the ALJ did not satisfactorily review the evidence, but rather focused on the prior RFC findings); *Cassaday v. Comm'r of Soc. Sec.*, No. 1:17-cv-630, 2018 WL 4519989, at *3 (W.D. Mich. 2018) (reversing where the ALJ's decision was not consistent with *Earley*'s requirement of independent review); *Brent v. Comm'r of Soc. Sec.*, Case No. 17-12654, 2018 WL 4403418, at *2–3 (E.D. Mich. 2018) (holding that pre-*Earley* ALJ sufficiently conducted an independent review of the evidence and did not simply adopt prior ALJ's findings wholesale); *Kamphaus v. Comm'r of Soc. Sec.*, No. 2:17-cv-11828, 2018 WL 3800243, at *5 (E.D. Mich. 2018) ("It is clear to the Undersigned that ALJ Deming did not simply apply *res judicata* principles and adopt ALJ Kalt's findings 'lock, stock and barrel,' but instead gave new consideration and analysis" to the new evidence.), *rep. & rec. adopted by* 2018 WL

3770045 (E.D. Mich. 2018); *see also Kimball v. Comm'r of Soc. Sec.*, Civil Action No. 17-12659, 2018 WL 4102845, at *5 n. 4 (E.D. Mich. 2018) (finding *Earley* did not change its analysis of pre-*Earley* ALJ decision because ALJ had concluded she was not bound by the previous RFC due to new and material evidence), *rep. & rec. adopted by*, 2018 WL 4095081 (E.D. Mich., 2018).[26]

In the present case, Johnson does not make an extended *res judicata* argument. His brief was filed before *Earley*, and he has not offered supplemental briefing on what effect, if any, that case has here. Instead, after block quoting *Drummond* and the ALJ's observance of the prior administrative decision in this case, he argues in full:

> In fact, the ALJ added new severe impairments, more specifically degenerative disc disease, obesity, and traumatic brain injury (Tr. 68) to the prior magistrate's list (Tr. 26). In addition, the ALJ imposed a more restrictive RFC, adding limitations as to climbing ramps, stairs, ladders, ropes, and scaffolds, as well as balancing, stooping, crouching, kneeling, and crawling (Tr. 27). When the evidence is appropriately analyzed [as Johnson purports to do in his second argument], and when plaintiff's elbow complaints are accounted for [as he does in his third argument], even further limitations will be in order.
>
>
> As a result, the ALJ was not precluded from re-assessing plaintiff's RFC and imposing additional limitations. In fact, plaintiff submits that he should have imposed more new limitations than he did.

(Doc. 16 at ID 926-27.)

---

[26] One out-of-Circuit court declined to apply *Earley* to a preceding ALJ decision, but did not explain why. *See Seabolt v. Berryhill*, 2018 WL 3545382, at *3 at n. 4 (N.D. Ind. July 23, 2016) (finding that "*Earley* had not been decided when the ALJ opined on Seabolt's case and therefore does not control this Court's analysis of the ALJ's decision"); *but see generally* Garner, et al., *The Law of Judicial Precedent* 308-10 (2016) (noting that judicial decisions generally have retroactive effect).

It seems that Johnson is arguing the ALJ was not bound by the prior RFC, and as proof of this, he points out that the RFC actually went beyond the earlier one. Of course, the ALJ did not purport to be unalterably bound by the prior RFC. And his decision to craft a more restrictive RFC demonstrates he did not feel bound by it. Johnson also does not appear to claim that the ALJ misapplied *Drummond*. And, in this argument, he does not discuss how the "new period" evidence (*i.e.*, evidence from after the prior ALJ decision) was "new and material."[27] AR 98-4(6), 1998 WL 283902, at *3. As such, he has not hit upon an exact argument under either *Drummond* or *Earley*.

Nor could Johnson find error under *Earley*. While the ALJ cited *Drummond* and AR 98-4, (Tr. 23), he thoroughly reviewed the evidence from the new period. (Tr. 29-35.) The analysis reads like a fresh look at a new case, unbeholden to the prior decision (which went unmentioned in the ALJ's substantive discussion). In fact, after discussing the old evidence covered by the previous decision, the ALJ stated that it was "not necessarily reflective of Claimant functioning during the relevant period." (Tr. 29.) This suggests that the ALJ's analysis centered on the new evidence, as it should under *Earley*. Consequently, even if Johnson argued that the ALJ botched the *res judicata* analysis, I would reject that claim.

---

[27] In his second argument he cites two records showing increased migraines in the new period, which he says, without explanation, "provides, in and of itself, the requisite new and material evidence permitting a change in the prior finding" under *Drummond*. (Doc. 16 at ID 928.) But he does not explain why the increased migraines would render him disabled. Likewise, at the end of his third argument, he states, "It should be further noted that this impairment [*i.e.*, his elbow condition] represents another reason that res judicata does not apply in this case." (*Id.* at ID 931.) He does not, however, attempt to show that the condition is "new and material" or apply any *res judicata* analysis.

### 2.      Substantial Evidence

Johnson next argues that the ALJ's RFC determination lacked substantial evidence. (Doc. 16 at ID 927-29.) As an initial matter, he claims that the ALJ was mistaken when asserting that plaintiff "had been successfully attending classes at a community college while earning average grades." (Tr. 33.) To the contrary, Johnson asserts the record is "replete with references to his problems" in school. (Doc. 16 at ID 927.) The only one Johnson mentions, however, was that he had to drop all classes one semester. (*Id.*, citing Tr. 486.) He completes this part of the argument by noting that the "ALJ specifically noted that plaintiff 'was struggling academically and needed to drop several classes.'" (*Id.*, quoting Tr. 33.)

Johnson's contentions on this point fail to persuade. For one thing, his citation to the ALJ's discussion of his academic problems undercuts the notion that the ALJ selectively culled facts to support the RFC while ignoring others. Instead, the ALJ gave a detailed description of Johnson's schooling as evidenced by the record. The decision states, for example, that school caused Johnson anxiety, (Tr. 30), and that he reported being a full-time student with plans to enter social work, (*id.*; *see also* Tr. 553-54, 684, 705). The statement Johnson finds problematic was, in fact, a nearly verbatim report of psychiatric notes, and the statement came during the ALJ's analysis of the medical opinion related to those notes. (Tr. 33, 514.) Thus, it is accurate in describing the cited materials and it was not used by the ALJ as a blanket statement of Johnson's school experience.

As for the ALJ's statement about Johnson's struggles in school, this also accurately reflected the cited medical records and was made while assessing another medical opinion.

37

(Tr. 33-34.) And the ALJ was justified in discounting the evidence of Johnson's scholastic struggles in this medical report because, as he pointed out, Johnson remained in school through the end of the administrative record and had plans to graduate. (Tr. 33-34.)[28] Finally, the record does not support his assertion he dropped *all* classes one semester—the cited record states he dropped "one of his classes last semester, [and] 'just barely passed' the others." (Tr. 487); *compare* (Doc. 16 at ID 927.) As the Commissioner points out in her brief, (Doc. 18 at ID 958), a different note around that time reported that Johnson was a current student at Oakland University but had to drop three classes due to "poor focus,

---

[28] Johnson is silent on whether attending school is good evidence of non-disability. It can be, but the ALJ must consider the possibility that while a claimant's impairment might not affect his or her ability to attend classes, it still could diminish the ability to hold a job. *See Hill v. Comm'r of Soc. Sec.*, No. 13-CV-15257, 2014 WL 6686789, at *18-19 (E.D. Mich. 2014). Johnson does not challenge the ALJ on this ground. The main impairments here, as his attorney suggested at the hearing, (Tr. 49), involved non-exertional limitations such as those caused by PTSD and the traumatic brain injury. In this regard, an ALJ might plausibly conclude that long-term attendance at school (even with some difficulties) requires the ability to focus and memorize materials, cutting against finding disability based on impairments in these areas. *Cf. Anderson v. Astrue*, No. CV-09-220, 2010 WL 2854241, at *5-8 (E.D. Wash. 2010) (citing college attendance as a reason to reject alleged psychological problems, including anxiety and memory problems, although many other reasons existed as well); *McElroy v. Astrue*, No. CV-08-0281, 2009 WL 2487043, at *8 (E.D. Wash. 2009) (upholding ALJ's credibility determination, noting that the claimant's "[c]omplaints of memory problems have not been corroborated by objective testing nor by plaintiff's ability to complete college classes"). Thus, Johnson's schooling might provide valid evidence supporting the conclusion he is not disabled due to anxiety or memory issues. Of course, a school schedule provides greater flexibility than a typical work schedule for an impairment such as migraines; so Johnson's ability to function in the classroom despite recurring migraines might not indicate he can likewise succeed at work. On the other hand, Johnson's assertion that the migraine's laid him out for two to six days a week might be hard to square with successfully completing college courses. (Tr. 43.) Given Johnson's failure to raise this point, however, and the proposed remand, it need not be definitively determined.

38

time management, and organizational skill." (Tr. 495.) But this does not suggest that the three classes were his entire course load.

The bulk of Johnson's second argument focuses on his headaches and migraines. He begins by arguing that the ALJ bungled the analysis of the March 2015 opinion by consultative examiners that he could not work due to his memory problems, PTSD, and head injury. (Doc. 16 at ID 927-28; Tr. 629.) Specifically, he takes aim at one of the reasons the ALJ gave for discounting the opinion: the ALJ said that Johnson's "treating records reveal that he had . . . much less frequent migraine headaches and [sic] stated at the time of this exam." (Tr. 34.) (For the sentence to make sense, the "and" probably should be "than.") This assertion, Johnson suggests, is baseless.

The March 2015 consultative examination records report that Johnson claimed daily migraines. (Tr. 620.) The record prior to the consultative examination does not suggest such constant migraines. In 2012, he reported that he had prostrating headaches four to five times a month. (Tr. 305.) In June 2013, the count was at one per week, (Tr. 608), and later in 2014 was at two to three, (Tr. 528), or three to four, (Tr. 516). The ALJ's analysis was accurate, then, to the extent it meant that the records prior to March 2015 did not support frequent headaches. Of course, if this is what the ALJ meant, it does not amount to much: an alleged increase in migraines must start sometime, and the preceding records will not, by definition, reflect the increase. But the ALJ's statement is inaccurate if it meant that all the records, past and present, undercut the complaint of increased headaches. After he reported daily migraines in March 2015, Johnson continued to complain that his migraines had increased, including in his function report for his disability claim and at the hearing.

(Tr. 43, 206, 705, 717, 731.) True, in December 2016, he stated that medications helped "a bit," (Tr. 705), but as Johnson notes in his brief, this "bit" of relief does not mean the frequency had decreased to its prior, lower level. (Doc. 16 at ID 929.)

The ALJ did *describe* these records. (Tr. 32, 34.) The problem with the ALJ's discussion of these increased migraines, however, is that it was merely descriptive rather than analytical. It failed to "build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 587 F.3d 920, 921 (7th Cir. 2010). Such an analysis here would not simply summarize the records, but also reach reasoned conclusions as to their worth and Johnson's credibility. Yet the ALJ's decision leaves many premises missing, failing to construct logical links between the fact that Johnson had migraines (or that they increased or were a "bit" better) and the conclusion that those migraines are not disabling. For example, the ALJ must not have found Johnson credible about the recent migraines, but the decision fails to state why. Instead, it hides behind a boilerplate line that the "Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 29.) But after stating this, the decision launches into a description of the records without saying which contradict Johnson's complaints or how.[29] And tucked at the end of the descriptions is a concluding, and conclusory, paragraph that begins, "In sum," and proceeds to list the short roster of Johnson's new ailments. (Tr.

---

[29] The decision has more analytical vigor in its discussion of the medical opinions, stating why it credited certain opinions. (Tr. 33-34.) But this does not specifically address Johnson's credibility or the post-March 2015 complaints of escalating migraines.

34-35.) But it does not state which evidence supports these conclusions, address Johnson's credibility, or take on the evidence of more frequent migraines.

An explanation along these lines is critical here because prostrating migraines at the level Johnson claimed during the hearing would preclude work, according to the VE. (Tr. 54.) And the increase is not, on its face, implausible given his long history of migraines, which had fluctuated somewhat throughout the record, as noted above. Consequently, the ALJ should have directly analyzed the alleged surge in migraines, providing specific and germane reasons for why Johnson was credible or not.

In short, the ALJ's analysis of Johnson's migraines, particularly the more recent complaints of an increase, is incomplete and therefore lacks substantial evidence.

### 3.    Elbow Condition

Finally, Johnson says that the "ALJ should have considered whether plaintiff's lateral epicondylitis would necessitate further restrictions" than those in the RFC. (Doc. 16 at ID 930.) He notes that the ALJ relied on records from April 2015 to justify ignoring the elbow condition, but the condition did not manifest until July 2015. (*Id.* at ID 931.)

The ALJ did not deem the elbow problem a severe impairment at Step 2. (Tr. 26.) But he was required to consider it at the later stages of the analysis, 20 C.F.R. § 404.1545(e), and he did, thoroughly canvassing the records relating to this alleged condition. (Tr. 32.) Johnson is correct, however, that the ALJ's analysis was anachronistic: Johnson first reported elbow pain in May 2015, which he said began three to four months earlier. (Tr. 782.) The ALJ, in discounting the elbow problem, relied on a medical consultative evaluator's report from April 2015, which the ALJ said did not show his tennis

41

elbow "cause[d] any specific limitations in functioning." (Tr. 34.)

There are a few things to unpack here. First, it appears that the ALJ's observation stems from the fact that the consultative report imposed no limitations on arm movement, because the report itself says nothing specific about tennis elbow. (Tr. 97-99.) Second, and related, the timing is off. While Johnson dated the start of his elbow pain to around March or April 2015—such that it could overlap with the consultative report, completed in April—it does not appear that the report was produced after an examination. Consequently, the evaluator relied on the documentary record extant in April 2015, and that record did not mention tennis elbow. So relying on the report to discredit elbow issues was a mistake.

Nonetheless, the ALJ cited other substantial evidence supporting his decision. For example, he noted that the lidocaine cream helped Johnson's elbow pain. (Tr. 32, citing 717.) Further, the ALJ described the results of an elbow examination showing normal range of motion without pain, swelling, or redness (but with "a bit" of pain upon full supination of the hand and forearm and tenderness to the touch). (Tr. 32, citing 719.) The ALJ decision also details that the steroid injections provided complete temporary relief, and that over-the-counter medications were recommended. (Tr. 32, citing 737.) Finally, the ALJ discussed the only other evidence of elbow pain in the record, the November 2015 emergency-room visit, which dealt with right elbow pain, tenderness, and mild swelling; but Johnson retained full range of motion despite the pain. (Tr. 32, citing 731.)

Thus, the ALJ engaged all the relevant materials, demonstrating the slim objective evidence of elbow pain. No record indicates that the pain restricted his movements, or even that he had much pain during movements. His treatment history is not lengthy and the

medications he took generally worked and were relatively conservative, consisting of prescriptions and over-the-counter medications. *Cf. Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("[H]is treatment [for extremity pain] was minimal and conservative during the period at question; [the claimant] was treated with medication only, and more recently simply over-the-counter medication.") It is unclear, too, whether one elbow or both was the chief source of problems. Johnson complained about left elbow pain, but in the last relevant record, it was his right elbow that produced pain during the examination while his left seemed normal (or at least did not merit comment in the emergency room examination notes, other than to say the right elbow appeared mildly more swollen).[30]

Perhaps due to the lack of objective evidence, Johnson cannot point to evidence establishing what additional limitations, if any, would flow from his elbow problem. Nor does he suggest any possible limitations. Instead, he merely notes that the job of garment sorter, which the VE identified, involves frequent use of arms and hands. (Doc. 16 at ID 930.) Without a more detailed analysis of specific limitations, however, Johnson has failed to cast doubt on the ALJ's findings, which are supported by substantial evidence.

In sum, the ALJ made a mistake in his analysis of the elbow pain, but adequately assembled substantial evidence supporting his conclusion.[31]

---

[30] Of course, the examination notes could be mistaken as to which elbow hurt, as they also state that Johnson presented with *left* elbow pain. (Tr. 730.) But there is no way to resolve that mystery at this point.

[31] Finally, it should be noted that Johnson does not challenge the ALJ's handling of any disability determinations made by the VA. *See generally Ritchie v. Comm'r of Soc. Sec.*,

**H.     Conclusion**

For these reasons, I conclude that substantial evidence does not support the ALJ's decision. Consequently, I recommend **GRANTING** Johnson's Motion, (Doc. 16), **DENYING** the Commissioner's Motion, (Doc. 18), **VACATING** the Commissioner's final decision denying benefits, and **REMANDING** the case to the Commissioner under "sentence four" of 42 U.S.C. § 405(g).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

---

540 F. App'x 508, 510 (6th Cir. 2013) ("We have held that a disability rating from the Veterans Administration is entitled to consideration [by a Social Security ALJ], but we have not specified the weight such a determination should carry when determining social security disability eligibility.").

1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 22, 2018                    S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 22, 2018                     By s/Kristen Castaneda
                                           Case Manager